**FIRST MED REPRESENTATIVES, LLC, Plaintiff,**

v.

**FUTURA MEDICAL CORP.,** Bionic Medizintechnik GmbH, Harold Callicoat, Ralf Jungmann, and Mac Jones, Defendants.

No. 01–73989.

United States District Court,
E.D. Michigan,
Southern Division.

March 18, 2002.

Steven C. Powell, Carson & Powell, Birmingham, MI, for Plaintiff.

David A. Breuch, Clark Hill, Detroit, MI, for Defendants.

## OPINION AND ORDER DENYING DEFENDANTS' MOTION TO DISMISS COUNT I

BORMAN, District Judge.

Before the Court is Defendants' motion to dismiss Count I (the antitrust claim) pursuant to Fed.R.Civ.P. 12(b)(6) (Docket Entry # 3). The Court heard oral argument on this motion on January 23, 2002. Upon consideration of the motion, the submissions of the parties, and the applicable law, the Court will DENY the motion.

## I. BACKGROUND

This is a commercial dispute involving the distribution chain for a certain medical supply: injection caps. Injection caps are "used in hospitals, often in conjunction with an intravenous procedure ("IV"), in order to safely allow the rapid infusion of certain drugs into an IV system hooked up to a patient." (Pl.'s Resp. at 2.) The market distribution chain at issue in this particular case is a multi-tiered distribution structure (i.e., one manufacturer, one purchaser, but multiple distributors in-between).

J. Sollner[1] is a European manufacturer of "certain yellow, packaged sterile latex-free injection caps." (Pl.'s Resp. at 2.) Defendant Bionic Medizintechnik GmbH ("Bionic") is a first level distributor located in Germany. Bionic distributes J. Sollner's injections caps to other distributors (some in North America, some elsewhere). Doris Wittel GmbH ("Wittel") is also a German distributor, and acted as Bionic's agent in the facilitation of sales to a United States distributor, Medical Profiles Inc. ("MPI"), prior to August of 2000.[2] Prior to that date, MPI sold the injection caps to user customers including Fresenius Medical Care, N.A. ("Fresenius").[3] Thereafter, Defendant Futura Medical Corp. ("Futura"), which apparently took over MPI in the fall of 2000,[4] became the distributor responsible for selling to, *inter alia*, Fresenius.

First Med Representatives ("First Med"), the Plaintiff in this case, has as two of its principals, John Ferszt and George Goll, who had developed a relationship with Fresenius when employed by MPI

1. J. Sollner is not a party to this case. It is unclear whether there is a subsidiary relationship between J. Sollner and Bionic.

2. Neither Wittel nor MPI are parties to this case.

3. Fresenius is not a party to this case.

4. The letter from Ralf Jungmann to John Ferszt, Exh. F to the Amended Complaint, alleges that "Medical Profiles [MPI] was sold in-between to the Futura group as new shareholder."

(now Futura), prior to their forming First Med. (*See* Letter from Jungmann to Callicoat, Exh. B to Amended Compl.), "John Firezt[sic]/George Goll managed to make use of their long term relationship to FMC [Fresenius] and the supply contract was rewarded to them."; Letter from Jungmann to Ferszt, Exh. F to Amended Compl., "... although we value your and George's efforts as former MPI executives very much .... We thank you and George very much for the given support as MPI executives during the last years."; *see also* Complaint, *Futura Med. Corp. v. Ferszt,* Case No. 01–72338 (E.D. Mich., June 22, 2001) (Hood, J.) (current post-employment dispute alleging, *inter alia,* breach of confidentiality agreement by Ferszt, using Futura's proprietary information in attempting to steal Fresenius as a customer).

In March of 2001, Ferszt and Goll formed First Med. In approximately March and April of 2001, Bionic allegedly represented that it would agree to sell injection caps to First Med either directly and/or through Wittel. (Amended Compl. ¶¶ 15–18.) On April 27, 2001, Fresenius executed a "Purchase Agreement" with First Med, (*see* Exh. A. to Amended Compl.), whereby Fresenius agreed to purchase its three-year requirements of injection caps from First Med, beginning August 1, 2001.

On May 20, 2001, a meeting allegedly occurred, in Michigan, between agents/representatives of Bionic, Wittel, and First Med. At that meeting, Plaintiff alleges that the Bionic Defendants agreed to sell the injection caps to First Med (directly, or through Wittel) for the purpose of the resale to Fresenius if First Med could obtain the business. (Amended Compl. ¶¶ 22–25.) The following day, on May 21, 2001, Fresenius (1) issued an initial purchase order with First Med for approximately 5000 boxes of injection caps,[5] and (2) issued a 90–day cancellation notice to Futura, as required by their contract.

Between May 21st and the end of May, 2001, a "flurry" of activity occurred between Bionic, Futura, Wittel, Fresenius, and First Med. Exhibits B—F, attached to Plaintiff's Amended Complaint, are letters written by Jungmann at Bionic, to Futura, First Med, etc., evidencing (in addition to the content of the letters themselves) several meetings/telephone conferences between representatives of all four companies discussing the distribution of the injection caps. The ultimate result was the termination of First Med as a distributor of the injection caps manufactured by J. Sollner. This result was reached when Bionic issued a letter of "Authorized Exclusive Distributor[ship]" (for sale of the injection caps in the United States and Canada) to Futura, as the "single authorized supply channel for Bionic Injection caps to FMC North America [Fresenius]." (*See* Letter from Jungmann to Callicoat, May 30, 2001, attached as Exh. D to Amended Compl.)[6]

There are aspects of some of the letters which support Plaintiff's allegation that

---

**5.** According to the Amended Complaint, prior to negotiations between First Med and Fresenius, Fresenius had been purchasing its injection caps from Futura for $15.21 per box (100 injection caps per box). The negotiated price from First Med, per the April 2001 agreement, was $12.63 per box, and if the invoice was paid within 10 days, an additional *1%* discount would be applied.

**6.** The letter is somewhat ambiguous, as it does not clarify whether Futura is the exclusive distributorship in the U.S. and Canada, or whether it is simply the "single authorized supply channel" to Fresenius. Plaintiff alleges that after the May 30, 2001 exclusive distributorship was allegedly formed, Bionic sold injection caps to other distributors in the U.S., naming Kendall as an example. (Amended Compl. ¶¶ 51–52.)

Bionic and Futura were engaged in anti-competitive behavior. There is one particular statement in the May 31, 2001 letter from Jungmann to First Med, informing them of the exclusive authorized distributorship:

> In order to *avoid a competitive situation* on the customer side, which would definitely lead to a negative impact for Bionic's business in the United States, a decision had to be made for an Exclusive Authorization Distributor.
>
> \* \* \* \* \* \*
>
> In order to avoid negative impact on our long term indirect customer, FMC [Fresenius], we would like to ask you to cancel the obviously existing contract with FMC [Fresenius] . . . .

(Exh. F to Amended Compl., at 1–2, emphasis added.)

Plaintiff also alleges that Defendants conspired to interfere with First Med's ability to supply Fresenius with injection caps from other manufacturers. (Amended Compl. ¶¶ 67–68.)

On October 19, 2001, Plaintiff filed its original complaint. The complaint names as defendants: Bionic Medizintechnik GmbH, and Ralf Jungmann ["Bionic Defendants"], and Futura Medical Corp., Harold Callicoat, & Mac Jones ["Futura Defendants"].

In lieu of answering the complaint, the Futura Defendants filed the instant motion to dismiss Count I on November 13, 2001. On December 14, 2001, Plaintiff filed a motion to amend its complaint. This Court granted that motion on January 14, 2002, as FED. R. CIV. P. 15(a) gives a plaintiff an absolute right to amend its complaint, once, before a responsive pleading is served, and the Sixth Circuit has held that a Rule 12(b)(6) motion is not a responsive pleading. *See Pertuso v. Ford Motor Credit Co.*, 233 F.3d 417, 420 (6th Cir.2000).

The Amended Complaint sets forth the following causes of action:

> Count I—Federal and State Antitrust Violations (Sherman Act, 15 U.S.C. § 1, and MICH. COMP. LAWS ANN. § 445.771 *et seq.*); against all Defendants
>
> Count II—Intentional Interference with Business Expectancy/Contract and/or Unfair Competition; against Futura Defendants (Futura, Callicoat, & Jones)
>
> Count III—Fraudulent/Negligent/Intentional Misrepresentation; Breach of Contract; and/or Intentional Interference with Business Expectancy/Contract; against Bionic Defendants (Bionic & Jungmann).

Currently before the Court is Futura Defendants' motion to dismiss Count I (the antitrust violations, both federal and state).

## II. ANALYSIS

### A. Standard of Review

A Rule 12(b)(6) motion alleges that a complaint has failed to state claim upon which relief can be granted. In evaluating such a motion, the court construes the complaint in the light most favorable to the plaintiff, accepts all factual allegations in the complaint as true, and determines whether the plaintiff undoubtedly can prove no set of facts in support of the claims that would entitle relief. *See* FED. R. CIV. P. 12; *Bloch v. Ribar*, 156 F.3d 673, 677 (6th Cir.1998); *see also Morgan v. Church's Fried Chicken*, 829 F.2d 10, 11 (6th Cir.1987). The purpose of a 12(b)(6) motion is "to test whether, as a matter of law, the plaintiff is entitled to legal relief even if everything alleged in the complaint is true." *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir.1993). Accordingly, when re-

viewing a Rule 12(b)(6) motion to dismiss, the court only examines whether the pleadings state a claim for which relief may be granted, and does not review additional evidence. *See Nieman v. NLO, Inc.*, 108 F.3d 1546, 1554 (6th Cir.1997).

A recent Supreme Court decision has cautioned district courts to exercise restraint, in analogous circumstances, in ruling on a motion to dismiss:

> ... Federal Rule of Civil Procedure 8(a)(2) [ ] provides that a complaint must include only a short and plain statement of the claim showing that the pleader is entitled to relief.... This simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims.
>
> \* \* \* \* \* \*
>
> Given the Federal Rules' simplified standard for pleading, a court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.
>
> \* \* \* \* \* \*
>
> Furthermore, Rule 8(a) establishes a pleading standard without regard to whether a claim will succeed on the merits.
>
> Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test.

*Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 122 S.Ct. 992, 998–99, 152 L.Ed.2d 1 (2002) (internal citations, alterations, and quotation marks omitted).

The Supreme Court has also cautioned that in antitrust cases, "dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Hospital Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 746, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976), cited in *Intellective, Inc. v. Massachusetts Mutual Life Ins.*

*Co.*, 190 F.Supp.2d 600, 606 (S.D.N.Y. 2002) (published).

## B. Antitrust Analysis

### 1. Michigan Antitrust Law Tracks Federal Antitrust Law

In *Blair v. Checker Cab Co.*, 219 Mich.App. 667, 675, 558 N.W.2d 439 (Mich. Ct.App.1996), the Michigan Court of Appeals held that Michigan's antitrust law (Michigan Antitrust Reform Act, or MARA) and the federal antitrust law (Sherman Act) "require similar evidence of concerted action or combination [such that the court must] consider federal precedent interpreting the Sherman Act's prohibition on combination in restraint of trade." The court then went on to analyze the plaintiff's claims solely with reference to federal case law interpreting the Sherman Act. Therefore, because Michigan courts apply Sherman Act analysis to the MARA, the following analysis applies to the entirety of Count I, for the allegations of both state and federal antitrust violations.

### 2. Sherman Act

Futura Defendants allege that Plaintiff's allegations in support of the antitrust claim(s) under the Sherman Act, 15 U.S.C. § 1, and the MARA, MICH. COMP. LAWS ANN. § 445.771 *et seq.*, are insufficient as a matter of law, for a number of reasons. First, Futura Defendants argue that Plaintiff is not entitled to sue. Next, Futura Defendants argue that Callicoat and Jones (as individuals) are improper defendants. Finally, Futura Defendants argue that under the "rule of reason" analysis, Plaintiff's allegations of the market, and harm to the market, are legally deficient. Each of these arguments will be addressed in turn.

#### a. Entitlement to Sue

Commentators have noted that while some litigants and courts confuse the

terms "antitrust standing" and "antitrust injury," and tend to lump in causation and damages analysis, these are in fact deserving of separate analysis. The commentators emphasize the need for courts to "be more precise in analyzing the bases of a plaintiff's entitlement to sue. Instead of determining whether a plaintiff has 'standing,' the courts should focus on particularized concerns of causation, remoteness, and antitrust injury." Jonathan M. Jacobson & Tracy Greer, *Twenty–One Years of Antitrust Injury: Down the Alley with Brunswick v. Pueblo Bowl–O–Mat*, 66 ANTITRUST L.J. 273, 312 (1998).

In order to pinpoint the issue, for purposes of determining whether a plaintiff is entitled to sue, the Court should assume that an antitrust violation has occurred, and that the plaintiff could so prove. *See, e.g., Watkins & Son Pet Supplies v. The Iams Company*, 254 F.3d 607, 616 (6th Cir.2001) (assuming *arguendo*, for purposes of the antitrust injury analysis, that plaintiff had made out a Clayton Act claim); *Ashmore v. Northeast Petroleum Div. of Cargill, Inc.*, 843 F.Supp. 759, 762 n. 5 (D.Maine 1994). This ensures that the merits of the claim are not confused with the preliminary inquiry into whether a lawsuit should be had at all.

Thus, for the purposes of the following inquiries only (remoteness, antitrust injury, and necessary predicate doctrine), the Court assumes that Plaintiff's allegation that Bionic and Futura agreed/conspired to fix prices in restraint of trade in the injection cap market—with regard to Fresenius, by eliminating First Med as a competitor when Bionic made Futura its "exclusive" authorized distributor in North America—violates § 1 of the Sherman Act. The merits will then be analyzed separately.

### (1) Remoteness

One element of so-called antitrust "standing" analysis is an inquiry into whether the plaintiff was directly harmed by the alleged conspiracy. It is a question of remoteness from the illegality, rather than a traditional "standing" analysis in the true meaning of that word. It does not ask whether the plaintiff was harmed by the illegality, or even whether the illegality caused plaintiff's harm, but rather, whether the plaintiff is in the proper position to challenge the illegality.

For instance, courts have held that landlords, creditors, and shareholders of an injured company are not entitled to sue for antitrust violations, because their harm, although caused by the challenged action, was too remote or distant from the action. *See* Jacobson & Greer, *supra*, at 285 (collecting cases). However, suits by direct purchasers and competitors do not present the same concerns of duplicative recovery, inefficient enforcer, etc. Purchasers and competitors are directly, rather than indirectly, harmed by the violation.

In short, the remoteness/directness of Plaintiff's injury in this case is not at issue. Futura Defendants are not alleging that Plaintiff is too far removed from the illegality to be able to challenge it. While Futura Defendants refer to a "standing challenge," they cite cases and apply the law as it relates to "antitrust injury" and the Sixth Circuit's "necessary predicate" doctrine (related to causation), not antitrust "standing." Because of the need for precision in the analysis, the Court will refrain from lumping the distinct issues into "standing."

### (2) Antitrust Injury

The analysis of whether a plaintiff has alleged an "antitrust injury" is traced to the landmark Supreme Court decision in *Brunswick v. Pueblo Bowl–O–Mat, Inc.*,

429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). In that case, Brunswick was one of the two largest manufacturers of bowling equipment, and made most of its sales through extending credit to the bowling centers, with the equipment acting as collateral for the credit. *Id.* at 479, 97 S.Ct. 690. When the bowling business sharply declined in the 1960s, Brunswick's sales dropped dramatically, and many of bowling centers indebted to Brunswick became delinquent. *Id.* In an attempt to salvage its assets and profit-making ability, Brunswick began to acquire some of the bowling centers, and ran them for profit. *Id.* at 479–80, 97 S.Ct. 690. Treadway Companies and ten of its wholly-owned subsidiaries were affected by Brunswick's acquisition of the failing bowling centers; they alleged that Brunswick should have simply allowed the centers to go out of business. The challengers alleged that Brunswick's acquisitions of the centers, and thus its presence in the "retail" market, violated the antitrust laws.

The Supreme Court defined the issue as "a narrow one ... whether antitrust damages are available where the sole injury alleged is that competitors were continued in business, thereby denying respondents an anticipated increase in market shares." *Id.* at 484, 97 S.Ct. 690. The Court, after analyzing the purpose behind the antitrust laws, held that in order to recover antitrust (i.e., treble) damages, a plaintiff must show an "antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Id.* at 489, 97 S.Ct. 690. The Court found that the damages claimed (lost profits the centers would have earned, but for Brunswick's presence in the market) would have been a result of an increase, rather than a decrease, in competition, and granted judgment in favor of Brunswick. *Id.* at 489–90, 97 S.Ct. 690.

Although *Brunswick* was a Clayton Act § 7 case, the Supreme Court subsequently made it clear that *Brunswick* applies to all private antitrust cases, regardless of the statutory provision under which a plaintiff sues. *See Atlantic Richfield Co. v. USA Petroleum, Co.,* 495 U.S. 328, 340–41, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990) [hereinafter *ARCO* ] (Sherman Act § 1 case; finding "not salient" the argument that *Brunswick* was distinguishable because it was brought under the Clayton Act). In *ARCO,* the Supreme Court worded the inquiry from *Brunswick* in slightly different (i.e., clearer) terms: "a plaintiff can recover only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior." *Id.* at 344, 110 S.Ct. 1884 (emphasis in original). Furthermore, *ARCO* held that even *per se* cases require proof of an antitrust injury. *Id.*

The Sixth Circuit has adopted a two-part test to analyze antitrust injury under *Brunswick:*

> antitrust plaintiff "must show (1) that the alleged violation tends to reduce competition in some market and (2) that the plaintiff's injury would result from a decrease in that competition rather than from some other consequence of the defendant's actions." P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 334.1b at 299 (1988 Supp.).

*Tennessean Truckstop, Inc. v. NTS, Inc.,* 875 F.2d 86, 88 (6th Cir.1989). In *Tennessean Truckstop,* the Sixth Circuit concluded that because the plaintiff was really not complaining about a decrease in competition in general, its injury did not flow from a competition-reducing aspect of the act at issue. *Id.*

█ In the instant case, contrary to Futura Defendants' assertions, Plaintiff's

injury flows from a competition-reducing (i.e., anticompetitive) aspect of the challenged act: its elimination from the injection caps market. While Futura Defendants are correct in arguing that the antitrust laws are aimed at protecting competition, not competitors, a competitor can nonetheless be a proper plaintiff, so long as the act of which it complains results in a decrease, rather than increase, in competition.

In this case, Plaintiff alleges that the agreement between Futura and Bionic will have two results: (1) eliminating a competitor, and thus reducing price competition in the injection market in general; and, (2) increasing prices, particularly, but not exclusively, for Fresenius—Fresenius' prices would have been lowered by First Med's entry in the market.

Although it is a close call, the Court finds, at this stage of the proceedings— Motion to Dismiss—that this case is sufficiently distinguishable from the above-cited cases. Plaintiff is alleging a harm directly to competition, and aspects of the challenged violation have affected First Med. First Med has sufficiently alleged an antitrust injury of the type the antitrust laws were meant to encompass to withstand the instant motion to dismiss.

Plaintiff in this case is asserting its desire to remain in a market that has become non-competitive, and to provide price competition. Plaintiff would benefit from participating in the market, through profits garnered by selling the injection caps at a price lower than the price Futura and Bionic may have set. Because of this distinction, the Court finds that the Plaintiff has alleged an antitrust injury, and is entitled to proceed past this stage of the proceedings.

The Court further finds persuasive a recent opinion from the United States Court of Appeals for the Third Circuit. In *Pace Electronics, Inc. v. Canon Computer Systems, Inc.*, 213 F.3d 118 (3d Cir.2000), plaintiff, a wholesale inkjet printer dealer, sued its supplier when the plaintiff's dealer agreement was terminated by the defendant. The plaintiff alleged that the defendant terminated its dealer agreement because of the plaintiff's refusal "to acquiesce in a vertical minimum price fixing agreement designed and implemented by [the defendant supplier] and [co-]defendant Laguna Corporation ..., [the plaintiff's] direct competitor in the New Jersey and New York region." *Id.* at 119. The plaintiff alleged it "suffered antitrust injury because it was terminated as a wholesale dealer after it sold Canon-brand products at prices below the minimum resale price allegedly fixed by Canon and Laguna." *Id.* at 121. The Third Circuit found "these allegations suffice to establish antitrust injury" under Supreme Court precedent *Id.* at 122. The court noted:

First, we believe that requiring a plaintiff to demonstrate than an injury stemming from a *per se* violation of the antitrust laws caused an actual, adverse effect on a relevant market in order to satisfy the antitrust injury requirement comes dangerously close to transforming a *per se* violation into a cause to be judged under the rule of reason.... Were we to accept the defendants' construction of the antitrust injury requirement, we would, in substance, be removing the presumption of anticompetitive effect implicit in the *per se* standard under the guise of the antitrust injury requirement.

Second, we do not believe that the Supreme Court's statement in [*ARCO*] that a plaintiff can recover for losses only if they stem "from a competition-reducing aspect or effect of the defendant's behavior," when viewed in the context of the Court's entire opinion, can be fairly read to require a terminated dealer to prove that its termination

caused an actual, adverse economic effect on a relevant market.... [T]he Supreme Court simply did not focus on whether the challenged conduct of the defendant had an actual, adverse economic effect on a relevant market.... The issue, thus, is not whether the plaintiff's alleged injury produced an anticompetitive result, but, rather, whether the injury claimed resulted from the anticompetitive aspect of the challenged conduct.

*Id.* at 123–24.

Similarly, when applying the *Pace* logic to the instant case, the Court concludes that First Med's alleged injury here "resulted from the anticompetitive aspect of the challenged conduct," i.e., the alleged conspiracy between Bionic and Futura to remove price competition in the injection cap market.

Although the Court recognizes this issue to be a close call, the Court nonetheless concludes, at this stage of the proceedings, that Plaintiff First Med should have the benefit of discovery in order to investigate whether the alleged conspiracy between Futura and Bionic involved an agreement regarding price levels. At oral argument on the instant motion, it was discovered that Plaintiff's attempts thus far of ascertaining the price level at which Futura/Bionic are selling to Fresenius, have been unsuccessful. The Court notes the importance of this issue as to the ultimate merits of this case.

Accordingly, the Court concludes that Plaintiff has set forth facts which, if proven, survive the antitrust injury requirement. Therefore, the Court DENIES Defendants' motion as to this issue.

### (3) Necessary Predicate

■ In the period of about eight years, the Sixth Circuit, through three cases, has developed what has become known as the "necessary predicate" doctrine, in applying the Supreme Court decision in *Brunswick v. Pueblo Bowl–O–Mat,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). This doctrine has its theoretical basis in causation, rather than "standing." The Sixth Circuit has used this doctrine to bar recovery in cases where the injury alleged could have resulted from some cause other than the antitrust violation. Jacobson & Greer, *supra,* at 299.[7]

In the first of the cases, *Axis, S.p.A. v. Micafil, Inc.,* 870 F.2d 1105 (6th Cir.1989), the Sixth Circuit addressed a situation where a company was attempting to enter the market for "armature winding machines" by purchasing one of the three manufacturers that had a patent to manufacture them. When one of the other manufacturers beat them to it (i.e., purchased the target manufacturer first), the plaintiff sued, alleging a Clayton Act violation, and a decrease in competition. The Sixth Circuit held that it was the lack of a patent, and not the competitor's action, that caused the plaintiff's harm—the plaintiff would have suffered the same harm even if a non-competitor had purchased the company. *Id.* at 1111–12.

About five years later, in *Hodges v. WSM, Inc.,* 26 F.3d 36 (6th Cir.1994), the Sixth Circuit confronted an alleged horizontal territorial allocation, whereby the airport shuttle services had agreed to let the defendant shuttle service operate the shuttle from the Nashville Airport to Opryland, exclusively. The Sixth Circuit applied *Axis, supra,* and found that because the conspiracy was not a "necessary predi-

---

**7.** This doctrine has been denigrated by at least one commentator (Jacobson & Greer, *supra,* at 299–302), as its logic is in direct conflict with the words of the statute (15 U.S.C. § 1) and the purpose behind punishing antitrust violations.

cate" to the injury (because Opryland could refuse the plaintiff access to its property absent the conspiracy), plaintiff did not sufficiently allege an antitrust injury. *Id.* at 39.

Then in *Valley Products Co. v. Landmark*, 128 F.3d 398 (6th Cir.1997), plaintiff was charging defendants with an illegal tying arrangement in the "guest amenities" market, whereby a bar soap manufacturer was denied "preferred supplier status" in favor of two other manufacturers. The franchisor (i.e., purchaser of the amenities) decided to cut back from six suppliers to two, and plaintiff was one of the four suppliers terminated. The Sixth Circuit, rather than ruling there was a lack of merit to the claim, in order to affirm its dismissal,[8] held that the plaintiff had failed to satisfy the "necessary predicate" test. After discussing *Axis* and *Hodges, supra*, the Sixth Circuit found:

> The loss of the logoed amenity sales suffered by Valley upon cancellation of its vendor agreement flowed directly from the cancellation, as we see it; the sales losses would have been suffered as a result of the cancellation whether or not HFS had entered into the alleged tying arrangements with the franchisees. Here, as in *Hodges*, the alleged antitrust violation was simply not a necessary predicate to the plaintiff's injury.

128 F.3d at 404.

The Sixth Circuit has recently reaffirmed the necessary predicate doctrine. In *Watkins & Son Pet Supplies v. Iams Company*, 254 F.3d 607, 616 (6th Cir.2001), the plaintiff's Clayton Act claim consisted of an allegation that defendant Iams Company's offered the plaintiff a 2% discount in exchange for an agreement to sell its products exclusively. Plaintiff asserted that Iams had promised that if plaintiff would agree to this exclusive arrangement now, when Iams later set up an exclusive territory distributorship, plaintiff would receive the Michigan market—a promise allegedly breached. The Sixth Circuit, relying on *Valley Products, supra*, found that the plaintiff's injury "flow[ed] from the termination [of its distributorship]; the antitrust violation was not a necessary predicate of the injury." 254 F.3d at 617.

This Court, bound by Sixth Circuit precedent, must, if the facts require, apply the necessary predicate doctrine. However, the cases above, and their holdings are distinguishable from the case at bar. To apply the language in *Valley Products* to the instant case, by inserting the facts in the instant case to where the facts of *Valley Products* were inserted before, would result in this rule: If Plaintiff's injury (lost profits from the Fresenius account) "would have been suffered as result of the [elimination of First Med as a competitor] whether or not [Futura and Bionic] had entered into the [exclusive distributorship agreement,] . . . [then] the alleged antitrust violation was simply not a necessary predicate to [P]laintiff's injury." 128 F.3d at 404. Conversely, if Plaintiff's lost profits from the Fresenius account could not have been suffered without the alleged antitrust violation (the conspiracy to eliminate First Med as a price competitor), then Plaintiff has stated an antitrust injury.

When the Court views the facts in a light most favorable to Plaintiff, as it must at this stage, it appears that absent the conspiracy to eliminate First Med as a price conspirator, First Med would still be selling injections caps to Fresenius at a

---

**8.** *See* 128 F.3d at 402 n. 3 ("The case at bar presents serious questions as to whether the HFS franchise package constitutes a product that is separate and distinct from the logoed amenities, and would thus be capable of serving as a 'tying product' for such amenities . . . .").

lower price. Plaintiff alleges that Bionic had agreed to First Med serving as a distributor to sell to Fresenius, before Futura learned that First Med had executed a contract with Fresenius. (Amended Compl. ¶¶ 22–25.) Plaintiff alleges that once it became clear to Futura that (1) First Med was selling to Fresenius at prices substantially below its own; (2) Futura was going to lose Fresenius as a customer, then Futura took action to ensure that Bionic would not sell to First Med, and that Futura would no longer be subject to entering into a bidding war with First Med (i.e., it would not be required to lower its price for the injection caps, based on First Med's competition). Plaintiff alleges that the letters attached to its complaint support this theory. Plaintiff premised its conclusion on its factual assertion that Bionic had agreed to allow First Med to serve as a distributor, prior to the "flurry" of activity in late May. (In other words, Bionic was perfectly willing to sell to First Med, presumably until Futura discovered this, and called Bionic to account for it.)

Under the facts alleged, First Med has sufficiently alleged that it would not have been eliminated as a distributor absent the Futura/Bionic conspiracy to set the price level for injection caps at or above the level First Med was willing to sell, and thereby eliminate future threats of increased price competition. Under these facts, the Court finds that application of the necessary predicate doctrine is not appropriate in this case. Assuming *arguen-* *do* that Plaintiff can make out an antitrust violation on these facts, then it was a necessary predicate to the harm Plaintiff alleges now. Thus, the Court DENIES Futura Defendants' motion as to this issue.[9]

### (4) Proper Defendants

■ Futura Defendants allege generally that the individual Futura defendants (i.e., Callicoat & Jones) are improper defendants for the antitrust claims. This allegation could be challenging two separate issues: (1) whether individual defendants, even when acting on behalf of a corporation, are subject to personal liability for violation of the antitrust laws; (2) whether, under the intra-corporate conspiracy doctrine, the individual defendants could have conspired with their own corporation, in violation of the antitrust laws. While it is clear that the intra-corporate conspiracy doctrine bars the latter, *see* *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 770–71, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984) (corporation cannot conspire with itself, for purposes of Sherman Act analysis), a fair reading of Plaintiff's Amended Complaint does not lead to the conclusion that Plaintiff is attempting to allege a conspiracy between, for instance, Futura on the one hand, and Callicoat and Jones on the other. To the contrary, the Amended Complaint clearly alleges a conspiracy between the Futura Defendants on the one hand (Futura, Cal-

---

9. This result is supported by a Sixth Circuit recent opinion. Without discussing, referring to, or even citing *Axis, Hodges,* or *Valley Products,* the Sixth Circuit held, in *Schwartz v. Sun Co.,* 276 F.3d 900, 903–05 (6th Cir.2002), that even though there was evidence that tended to show that the plaintiff's losses were either the result of the defendant's antitrust violation, or "other factors," the plaintiff had still met the antitrust injury requirement. The dissent (Suhrheinrich, J.) concluded that the antitrust injury component was not met,

as the district court had concluded, because there was not sufficient evidence that the lost sales resulted solely due to the antitrust violation. *See id.* at 905–06.

*See also In re Cardizem CD Antitrust Litigation,* 105 F. Supp.2d 618, 650 (E.D.Mich. 2000) ("To establish antitrust injury, Plaintiffs are not required to eliminate the hypothetical possibility that Defendant Andrx might have unilaterally delayed entry into the market even absent the [challenged] agreement.").

licoat, and Jones) and the Bionic Defendants on the other (Bionic, and Jungmann). (Amended Compl. ¶ 31.)

 As to the former issue, it is equally clear that there is no bar to individual civil liability for antitrust violations, even by an employee/officer of a corporation, acting on behalf of the corporation. *See Brown v. Donco Enterprises, Inc.,* 783 F.2d 644, 646 (6th Cir.1986) ("Individual liability under the antitrust laws can be imposed [ ] where corporate agents are actively and knowingly engaged in a scheme designed to achieve anticompetitive ends. To support a determination of liability under this standard, the evidence must demonstrate that a defendant exerted his influence so as to shape corporate intentions.") (citing *Murphy Tugboat Co. v. Shipowners & Merchants Towboat Co., Ltd.,* 467 F.Supp. 841 (N.D.Cal.1979)); *see also C & W Construction Co. v. Brotherhood of Carpenters and Joiners of America, Local 745, AFL–CIO,* 687 F.Supp. 1453, 1464–65 (D.Haw.1988) (also citing *Murphy Tugboat, supra,* and finding, based on principles of agency law, that union defendants could be individually liable for antitrust violation for coercing suppliers not to deal with plaintiff).

Thus, Plaintiff has sufficiently alleged individual liability on the part of Callicoat and Jones. Futura Defendants' motion is DENIED as to this issue.

### b. Substantive Violation—Per Se Illegality, or Rule of Reason Analysis

Section 1 of the Sherman Antitrust Act provides, in relevant part:

Every contract, combination . . ., or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal.

15 U.S.C. § 1. The Sixth Circuit has recently, and clearly, set forth the law regarding private (civil) § 1 Sherman Act claims:

When concerted action is challenged as an unlawful restraint on trade under Section 1 of the Act, courts will normally examine the claim by applying the rule of reason. *See Business Electronics Corp. v. Sharp Electronics Corp.,* 485 U.S. 717, 723, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988). Under the rule of reason "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Id.* (quoting *Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 49, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977)) (citations omitted). "Under . . . the 'rule of reason,' it is necessary to 'evaluate [the restriction] by analyzing the facts peculiar to the business, the history of the restraint, and the reasons it was imposed . . . to form a judgment about the competitive significance of the restraint.'" *Lie v. St. Joseph Hosp. of Mount Clemens,* 964 F.2d 567, 569 (6th Cir.1992) (quoting *Nat'l Soc'y of Prof'l Eng'rs v. United States,* 435 U.S. 679, 692, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978)).

In analyzing agreements that are not *per se* violations of the antitrust laws, the court is looking to whether the action complained of has the potential for genuine adverse effects on competition, and this analysis usually involves an inquiry into market definition and market power.

*Id.* (quoting *FTC v. Indiana Fed'n of Dentists,* 476 U.S. 447, 460, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986)) (quotation marks omitted).

Conduct that is "manifestly anticompetitive" is illegal *per se* under the Act and is not examined on a case-by-case basis. *Id.* (quoting *GTE Sylvania,* 433

U.S. at 50, 97 S.Ct. 2549, 53 L.Ed.2d 568). Conduct that is illegal *per se* under the Act involves practices or agreements "that would always or almost always tend to restrict competition and decrease output." *Id.* (quoting *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.,* 472 U.S. 284, 289–90, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985), in turn quoting *Broadcast Music Inc. v. Columbia Broad. Sys., Inc.* 441 U.S. 1, 19–20, 99 S.Ct. 1551, 60 L.Ed.2d 1, (1979)).

Trade restraining agreements scrutinized under the Act can be categorized as horizontal—"agreements between competitors at the same level of market structure," or vertical—"combinations of persons at different levels of the market structure, such as manufacturers and distributors." *Bailey's, Inc. v. Windsor Am., Inc.,* 948 F.2d 1018, 1027 (6th Cir. 1991) (quoting *Oreck Corp. v. Whirlpool Corp.,* 579 F.2d 126, 131 (2d Cir.), *cert. denied,* 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978), as quoted in *Crane & Shovel Sales Corp. v. Bucyrus–Erie Co.,* 854 F.2d 802, 805–06 (6th Cir.1988)). Vertical restraints primarily affect intrabrand competition, while horizontal restraints primarily affect interbrand competition.

Vertical restraints on trade are examined under a rule of reason analysis unless they include "some agreement on price or price levels." *Business Electronics Corp.,* 485 U.S. 717, 735, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988). The rationale for different treatment of vertical restraints is that "as long as interbrand brand competition existed, that would provide a 'significant check' on any attempt to exploit intrabrand market power," because interbrand competition is "the primary concern of antitrust law." *Id.* at 724, 725, 485 U.S. 717, 108 S.Ct. 1515, 99 L.Ed.2d 808 (quoting *GTE*

*Sylvania Inc.,* at 52, n. 19, 97 S.Ct. 2549).

Consistent with this rationale is the requirement that a plaintiff seeking redress under the Act must show that the complained-of restraint of trade had an effect on competition at the interbrand level. *See Crane & Shovel Sales Corp. v. Bucyrus–Erie Co.,* 854 F.2d 802, 810 (6th Cir.1988).

*Ezzo's Investments, Inc. v. Royal Beauty Supply, Inc.,* 243 F.3d 980, 986–87 (6th Cir.2001).

■■■■■ To summarize, a vertical restraint, such as an agreement between companies at different levels of the marketing structure, is analyzed under the rule of reason, unless the restraint includes an agreement as to a price or a price level. *Ezzo's,* 243 F.3d at 987 (citing *Business Electronics,* 485 U.S. at 735, 108 S.Ct. 1515). If there is an agreement as to price/price level, the vertical restraint is subject to *per se* treatment. *Id.* Because the application of either of these analyses tends to dictate the disposition of the case, it is imperative that the classification of the violation be correct.

It is undisputed that the restraint at issue is a vertical restraint, because Bionic and Future are at different levels in the marketing structure (Bionic is a first level distributor, which distributes to other distributors, such as Futura, which then distributes to the purchaser). The only classification issue is whether the restraint includes an agreement as to price or price level.

### (1) Per Se Violation

■■ In the instant case, Plaintiff argues that it has alleged a *per se* violation, citing *Monsanto Co. v. Spray–Rite Serv. Corp.,* 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984) and *Business Electronics Corp. v. Sharp Electronics Corp.,* 485

U.S. 717, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988). Futura Defendants argue simply that Plaintiff has not alleged a price-fixing situation. Futura Defendants do not cite to this Court any case law for the weight of evidence Plaintiff must provide at this stage to substantiate a price-fix claim. Rather, Futura Defendants argue that absent an allegation that Defendants conspired to fix prices for the entire market, Plaintiff's *per se* claim fails. However, the cases cited by Futura Defendants do not support this proposition, and further, the theory that price-setting for the entire market is required, is against not only logic, but also against the purpose of requiring separate liability under § 1 and § 2 of the Sherman Act.[10]

In *Monsanto,* the plaintiff was an authorized distributor for Monsanto's herbicide products for over a decade, when Monsanto terminated its distributorship. 465 U.S. at 755, 104 S.Ct. 1464. The plaintiff (Spray–Rite) alleged that it had been terminated in furtherance of a conspiracy between Monsanto and other distributors to fix prices, as evidenced by the other distributors' complaints to Monsanto about Spray–Rite's price cutting behavior. The Supreme Court found that this behavior would be *per se* illegal under § 1 of the Sherman Act only if the terminated distributor had evidence, more than just distributors' complaints, to suggest that the manufacturer was not acting unilaterally. *Id.* at 764, 104 S.Ct. 1464. The Court found, in applying that standard to the facts, "*substantial* direct evidence of agreements to maintain prices" and terminate price-cutters, including testimony that Monsanto had approached price-cutting distributors and threatened to cut off their

supply if they did not maintain the resale price. *Id.* at 765, 104 S.Ct. 1464. The Court also noted that it would have been reasonable to find the agreement related to the termination of Spray–Rite

since it was necessary for competing distributors contemplating compliance with suggested prices to know that those who do not comply will be terminated. Moreover, there is some circumstantial evidence of such a link. Following the termination, there was a meeting between Spray–Rite's president and a Monsanto official. There was testimony that the first thing the official mentioned was the many complaints Monsanto had received about Spray–Rite's prices. Tr. 774, 1295. In addition, there was reliable testimony that Monsanto never discussed with Spray–Rite prior to the termination the distributorship criteria that were the alleged basis for the action. See 684 F.2d, at 1239. By contrast, a former Monsanto salesman for Spray–Rite's area testified that Monsanto representatives on several occasions in 1965–1966 approached SprayRite, informed the distributor of complaints from other distributors—including one major and influential one, see Tr. 126, 135—and requested that prices be maintained. Tr. 109–110, 114. Later that same year, Spray–Rite's president testified, Monsanto officials made explicit threats to terminate SprayRite unless it raised its prices. Tr. 619, 711.

*Id.* at 767–68, 104 S.Ct. 1464 (footnotes omitted). The Court found that the evidence presented created a triable issue of fact as to whether Spray–Rite was termi-

---

**10.** Futura Defendants assert that because Plaintiff has not alleged that Futura and Bionic conspired to set prices *"in the entire market place"* (Futura Def.'s Reply, at 4, emphasis in original), Plaintiff's *per se* claim fails, citing *Ezzo's Investments Inc. v. Royal Beauty Sup-*

*ply,* 243 F.3d 980 (6th Cir.2001) and *Business Electronics Corp. v. Sharp Electronics Corp.,* 485 U.S. 717, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988). Neither of those cases require price fixing for the entire market.

nated in furtherance of the price-fixing conspiracy. *Id.* at 768, 104 S.Ct. 1464.

In *Business Electronics,* the plaintiff was a calculator dealer that sued its supplier, when the supplier terminated the dealer at the request of one of the dealer's competitors. The evidence had not uncovered any agreement on price or price levels. The Supreme Court held that "a vertical restrain is not illegal *per se* unless it includes some agreement on price or price levels." 485 U.S. at 735–36, 108 S.Ct. 1515. In rejecting the *per se* treatment, the Court noted "Petitioner has provided no support for the proposition that vertical price agreements generally underlie agreements to terminate a price cutter." *Id.* at 731, 108 S.Ct. 1515.

In support of its argument that it has alleged a *per se* violation, Plaintiff alleges that Futura and Bionic conspired to set the price level of the injection caps at or above First Med's price, and enforced this agreement by forming an exclusive distributorship, such that First Med could not under-price Futura's sales to Fresenius, or anyone else. Plaintiff's allegations are somewhat conclusory. Plaintiff's "proof," attached to its complaint, does not mention price or price levels. Plaintiff is asking for one of two things: (1) a presumption that because First Med's prices were substantially below Futura's, and because First Med's distributorship was terminated shortly after it became known that First Med obtained Fresenius' business based on its price, that First Med has made out a prima facie case to show that the Bionic/Futura conspiracy involved the setting of price levels; or (2) at the very least, the opportunity to conduct discovery for additional evidence that Bionic/Futura conspired to set prices/price levels.

Although Plaintiff's complaint consists of largely conclusory allegations, Plaintiff nonetheless has alleged a sequence of events that, when viewed in the light most favorable to Plaintiff, may tend to show that Bionic/Futura conspired to set the price level at or above the level at which First Med had offered to sell injection caps to Fresenius. As noted above, since Plaintiff's attempts to discover whether there was an agreement as to price level have thus far been met with resistance, Plaintiff will be given the opportunity to substantiate its price-fix theory through discovery.

Due to the result reached via the *per se* analysis, the Court need not address the rule of reason argument. However, for the sake of thoroughness, the rule of reason analysis follows.

### (2) *Rule of Reason*

 As noted above, absent an agreement as to price or price levels, the vertical restraint at issue here must be analyzed under the rule of reason. As further noted above, the rule of reason requires analysis of the particularities of the business, the market forces, and the reason for the restraint.

In a case extremely close to the instant case on its facts, a federal district court in Illinois found that although the plaintiff could make out a claim to be analyzed under the rule of reason inquiry, the plaintiff had failed to sufficiently allege a *per se* claim. In *Danielson Food Products, Inc. v. Poly–Clip System,* 120 F.Supp.2d 1142 (N.D.Ill.2000), the plaintiff was a sausage manufacturer who had attempted to purchase a new sausage making machine from the machine's manufacturer. The machine manufacturer refused to sell the machine to the plaintiff, because the machine manufacturer had entered into an agreement with one of the plaintiff's competitors in the sausage making market. The issue before the court was "whether [the agreement between the machine manufacturer and plaintiff's competitor], excluding only [plaintiff] from the world of possible cus-

tomers, constituted a per se illegal restraint of trade under Section 1 of the Sherman Act." *Id.* at 1143. The court held that the agreement was a vertical nonprice restraint, and thus subject only to rule of reason analysis. *Id.* at 1145. In rejecting *per se* treatment of the agreement at issue, the court rejected the plaintiff's attempt to argue that because eliminating plaintiff as a competitor in essence protected against competition, that the agreement was, in essence, about price.

In the instant case, there is some indication that the purported "exclusive distributorship agreement" might have been simply a rouse to keep First Med from being able to sell to Fresenius. As mentioned above (*see* Facts section, *supra*), the document purporting to make Futura the exclusive distributor specifically references sales to Fresenius. Furthermore, Plaintiff has alleged that another distributor, Kendall, has purchased from Bionic/Wittel. If this is the case, and if Plaintiff is unable, through discovery, to show a direct agreement setting price/price levels, then under *Danielson*, Plaintiff will have failed to allege a *per se* violation, and must proceed, if anything, with the rule of reason analysis.

In *Crane & Shovel Sales Corp. v. Bucyrus–Erie Co.*, 854 F.2d 802 (6th Cir.1988), the Sixth Circuit confronted a situation close to the facts in the case at bar. In that case, a distributor of machinery parts was terminated (allegedly, along with other distributors) when one of the principals of the manufacturer of machinery parts started up his own distribution business, and then awarded his personal company the exclusive distributorship from his employing company. There were no allegations about illegal price constraints. *See id.* at 811 (dissent). The Sixth Circuit found that the case was subject to rule of reason analysis, holding "a complaint which simply alleges that a manufacturer substituted one distributor for another

fails to state a violation of the rule of reason, *unless* it also alleges anticompetitive effect at the interbrand level." *Id.* at 806. The court rebuffed the plaintiff's attempts to argue the case should be distinguished because it was not a substitution of one distributor over another, but the complete elimination of all competition in the distribution chain. The court stated:

> However, even if we assume the complaint to state the elimination of a plurality of distributors, and therefore the elimination of intrabrand competition, we hold that the complaint nevertheless fails to allege restraint of trade under Section 1 of the Sherman Anti-trust Act.

*Id.* at 807.

The court faulted the plaintiff's complaint for failing to allege anticompetitive effect at the inter-(rather than intra-)brand level, in addition to failing to allege any anticompetitive purpose of the agreement. The court found that it was simply another example of a "jilted distributor" case, and affirmed the district court's dismissal of the case on a motion to dismiss. *Id.* at 810.

In the instant case, Plaintiff's complaint is completely devoid of any allegation that interbrand competition has suffered. In other words, Plaintiff has failed to allege that the market for injection caps between manufacturers other than J. Sollner has suffered due to the Bionic/Futura agreement not to permit First Med into the market. Based on *Crane*, if the rule of reason analysis is to be applied, Plaintiff's complaint fails to state a claim, and is indistinguishable from the "jilted distributor" cases referenced in *Crane*.

However, as noted above, Plaintiff will be permitted to conduct discovery on its *per se* violation theory. The Court will thus DENY Futura Defendants' motion to dismiss Count I.

### III. *ORDER*

For the reasons set forth above, the Court DENIES the motion to dismiss Count I.

**SO ORDERED.**