**COMPUWARE CORP., Plaintiff,**

v.

**INTERNATIONAL BUSINESS MACHINES CORP.,
Defendant.**

No. 02–CV–70906.

United States District Court,
E.D. Michigan,
Southern Division.

Feb. 3, 2005.

Daniel Johnson, Jr., Fenwick & West, Palo Alto, CA, David A. Ettinger, Honigman, Miller, (Detroit), Detroit, MI, Elizabeth H. Tipton, Houston, TX, Harry C. Goplerud, Honigman, Miller, (Bingham Farms), Bingham Farms, MI, Stuart P. Meyer, Fenwick & West, Mountain View, CA, for Plaintiff.

Evan R. Chesler, Rowan D. Wilson, Thomas G. Rafferty, Cravath, Swaine, Kurt E. Richter, Morgan & Finnegan (New York), New York City, Larry J. Saylor, Larry J. Saylor, Saul A. Green, Jonathan W. Fountain, Miller, Canfield, (Detroit), Detroit, MI, for Defendant.

## ORDER GRANTING IN PART AND DENYING IN PART IBM'S MOTION FOR SUMMARY JUDGMENT

STEEH, District Judge.

### FACTUAL BACKGROUND

Compuware is one of several independent software vendors ("ISV") that provide software tools used on IBM mainframe systems. There are five relevant "Mainframe Software Tools" markets at Issue: (1) File and Data Management Products; (2) Fault Diagnosis Products; (3) Interactive Analysis and Debugging Products; (4) Database Tools; and (5) Performance Analyzers. Compuware possesses the dominant market share in each of the alleged tools markets.

In 2000, IBM launched its File Manager and Fault Analyzer products, which compete with Compuware's File–AID and Abend–AID products. IBM states that it entered the market for software tools ("AD tools" or "tools") in order to reduce the total cost of ownership of IBM mainframe computing systems, not to become the largest seller of tools.

IBM possesses a monopoly position in high-end mainframe computers and the basic software used to run those computers. Compuware alleges that after IBM entered the AD tools market, it began to deny critical pieces of information about its mainframe software to Compuware and other ISVs. Compuware also maintains that once it started to sell its tools, IBM began to tie its tools products to its monopoly mainframe products. Finally, Compuware alleges that IBM offered its tools at predatory prices.

The Court has considered the arguments made by counsel for both parties, and, for the reasons given below, denies summary judgment on Compuware's tying claim and three state unfair competition claims. The Court grants summary judgment on Compuware's attempted monopolization and monopoly leveraging claims.

### STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) empowers the court to render summary

judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Redding v. St. Eward,* 241 F.3d 530, 532 (6th Cir.2001). The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice. The procedure is not a disfavored procedural shortcut. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Cox v. Kentucky Dept. of Transp.,* 53 F.3d 146, 149 (6th Cir.1995).

The standard for determining whether summary judgment is appropriate is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Amway Distributors Benefits Ass'n v. Northfield Ins. Co.,* 323 F.3d 386, 390 (6th Cir.2003) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Redding,* 241 F.3d at 532 (6th Cir.2001). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original); *see also National Satellite Sports, Inc. v. Eliadis, Inc.,* 253 F.3d 900, 907 (6th Cir.2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 270, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); *see also McLean v. 988011 Ontario, Ltd.,* 224 F.3d 797, 800 (6th Cir.2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson,* 477 U.S. at 248, 252, 106 S.Ct. 2505. Rather, there must be evidence on which a jury could reasonably find for the non-movant. *McLean,* 224 F.3d at 800 (citing *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505).

## ANALYSIS

### I. *Unlawful Tying—Sherman Act § 1*

The Sherman Act does not explicitly prohibit tying arrangements. However, such arrangements can violate Section 1 of the Sherman Act when they produce an anticompetitive effect. A tying arrangement may also support a claim for monopolization under Section 2 of the Sherman Act. See, *Highland Capital, Inc. v. Franklin National Bank,* 350 F.3d 558, 564–65 (6th Cir.2003).

A tying arrangement is defined "as an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Northern Pac. Ry. Co. v. United States,* 356 U.S. 1, 5–6, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); *Eastman Kodak Co. v. Image Technical Services, Inc.,* 504 U.S. 451, 461–62, 112 S.Ct. 2072, 119 L.Ed.2d

265 (1992). Tying arrangements have been found to be "unreasonable in and of themselves whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a 'not insubstantial' amount of interstate commerce is affected." *Northern Pac. Ry.*, 356 U.S. at 6, 78 S.Ct. 514. A tying claim under the Sherman Act requires that the plaintiff prove that a seller had substantial economic power in the tying product's market, and an anticompetitive effect in the tied-product market *Highland Capital*, 350 F.3d at 565 (citations omitted), *Eastman Kodak*, 504 U.S. at 462, 112 S.Ct. 2072 (arrangement constitutes impermissible tie under § 1 of Sherman Act "if the seller has 'appreciable economic power' in the tying product market and if the arrangement affects a substantial volume of commerce in the tied market.").

The Supreme Court has "condemned tying arrangements when the seller has some special ability—usually called "market power"—to force a purchaser to do something that he would not do in a competitive market.... [citations omitted]. When 'forcing' occurs, our cases have found the tying arrangement to be unlawful." *Jefferson Parish Hospital v. Hyde*, 466 U.S. 2, 13–14, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984). "[F]rom the standpoint of the consumer—whose interests the statute was especially intended to serve—the freedom to select the best bargain in the second market is impaired by his need to purchase the tying product, and perhaps by an inability to evaluate the true cost of either product when they are available only as a package." *Id.* at 15.

■ There are two theories of tying— *per se* and rule-of-reason. Under rule-of-reason analysis, the antitrust plaintiff must show an adverse effect on competition.

The Sixth Circuit has adopted the following three-step analysis for determining whether a tying arrangement is likely to cause such an anticompetitive effect: "(1) the seller must have power in the tying product market; (2) there must be a substantial threat that the tying seller will acquire market power in the tied-product market; and (3) there must be a coherent economic basis for treating the tying and tied products as distinct." *Hand v. Central Transp., Inc.*, 779 F.2d 8, 11 (6th Cir.1985). Under traditional per se analysis, restraints of trade were condemned without any inquiry into the market power possessed by the defendant. However, under current per se analysis, the antitrust plaintiff must show the seller possesses substantial market power in the tying product market and that the arrangement affects a substantial volume of commerce in the tied market. *Kodak*, 504 U.S. at 462, 478–79, 112 S.Ct. 2072. The two theories differ in only one respect—the per se analysis dispenses with proof of anticompetitive effects. *PSI Repair Services, Inc. v. Honeywell, Inc.*, 104 F.3d 811, 815 n. 2 (6th cir.1997) (citing 10 Phillip E. Areeda et al., *Antitrust Law* ¶ 1760e, at 372 (1996)).

Compuware alleges a *per se* tying arrangement by IBM in this case. IBM clearly has substantial power in the alleged tying product market of mainframe computers and/or critical software ("mainframe products"). Therefore, the Court will focus on Compuware's contentions that IBM has forced customers to take its tools, and that IBM's alleged tying arrangements affect a substantial volume of commerce in the tools market.

A. *Evidence of tying*

■ IBM argues that the fact that the tools are sometimes sold in discounted packages (called Enterprise License

Agreements or ELAs) does not demonstrate the existence of a tie. See, *Jefferson Parish*, 466 U.S. at 12, 104 S.Ct. 1551. IBM describes the ELAs as multi-product package discounts where the customer chooses among hundreds of products—only a handful of which are the alleged tools products at issue in this case—and receives the same discount regardless of whether the customer chooses to include tools or instead chooses any other of the hundreds of IBM's OTC software products.

IBM maintains that it is not guilty of tying because it sells its mainframe products separately from the software tools. Nearly 90% of IBM's customers have purchased mainframe products without also purchasing IBM's tools. For example, of the 3,163 customers that have purchased an alleged tying product, only 445 customers (about 14%) have also purchased File Manager, Fault Analyzer or both.

On the other hand, Compuware argues that the statistics relied on by IBM merely demonstrate that IBM has been very selective in its efforts to force tying agreements. Compuware cites 23 examples of tying from a subgroup of 75 IBM accounts ordered by the Court to be turned over in discovery. Of these 23 instances of tying, about half were made to customers among Compuware's top 50 accounts. (Meyer Rep. Tab W (Tab 3) gives lost profits, but total lost sales would better represent the amount of commerce affected, and would be a greater number). What appears to be undisputed is that nearly 90% of IBM's mainframe customers purchase the alleged tying products without purchasing the tied products. This would mean that 10% of IBM's customers do purchase both mainframe products and software tools from IBM. The corollary is that more than 90% of IBM's mainframe customers purchased AD tools from ISVs.

Forcing can exist when tying is "economic", i.e., when the products are available separately, but only at significant economic disadvantage. Compuware alleges that IBM's bundles are often structured and priced so that customers have no sound economic alternative but to accept the offer. IBM uses ELAs as the sole vehicle to discount its monopoly mainframe software products and other monthly license charge products. Therefore, to obtain any discount, a customer must take IBM tools or other OTC products. According to Compuware's expert, Jeffrey MacKie Mason:

> In some cases, the price of the tools in the bundle is negative: that is, the price of the bundle without the tools is *higher* than the price with the tools. In other cases the customer is offered enormous discounts on the monopolized products, and then told that the offer is all-or-nothing, i.e., no unbundling permitted.

(MacKie Mason Rep. at 91). Furthermore, IBM refuses to disclose what the individual prices would be if the customer wanted to buy certain products separately. IBM trains its sales force to "Never, Ever Disclose Component ELA prices." (Compuware Exhibit 44, 45). IBM has described ELAs as "a powerful lever against competition" that "[l]ocks out competitors, minimizes threat, and increases [IBM] market share." (Compuware Exhibit 60).

Professor MacKie Mason looked at the 75 accounts produced by IBM. From this evidence he came up with the alleged 23 instances of tying, including the following examples:

> *Blue Cross Blue Shield of Kansas* ("BCBS Kansas")—IBM initially offered its tools to BCBS Kansas at no charge as part of a two-year ELA. BCBS Kansas "wanted IBM to remove the Compuware replacement products from the ELA. We don't want them." (Compu-

ware Tab 98). IBM threatened to offer only a 1–year ELA deal in response, and that some or all of the $485,000 in discounts would be at risk if BCBS Kansas rejected the no charge IBM tools. (Compuware Tab 97). BCBS Kansas ended up taking the IBM tools as part of the ELA. (Compuware Tab 95).

*Exxon Mobil*—IBM told Exxon Mobil it would lose preferential pricing on IBM monopoly software, unless it acquired ISV replacement tools from IBM. This preferential pricing on monopoly products amounted to $5.4 million in savings to Exxon Mobil, but which hinged on Exxon Mobil taking IBM's Fault Analyzer and File Manager at a combined business as usual price. (Compuware Tab 52 and Tab 94).

*Delta Airlines*—Delta Airlines informed IBM: "We need to remove the [IBM] tools. The IBM product did not work. . . . It must be removed." (Compuware Tab 104). IBM's offer to Delta was "CONTINGENT upon including ALL of the S/390 OTC tools", including the AD tools. (Compuware Tab 48). IBM told Delta that it cannot "just pull [the IBM tools] out without any implications to the AMO." (Compuware Tab 55). "[A]ll of the software must be included in the AMO for the discount and special waivers [on MCL products] to come into play." (Compuware Tab 55; Ozley dep. at 137). Delta took the IBM tools as part of the AMO. (Compuware Tabs 53 and 54).

These are just three of several examples where the customer requested to have the tools removed, were told by IBM that it would be to their disadvantage economically, and ended up taking the IBM tools as part of the ELA or AMO.

It should be noted that the fact that only 10% of IBM's mainframe customers are also purchasing its tools is of no signifi-

cance in determining whether the company is engaged in forcing sales, so long as the volume of those sales is not insignificant.

Professor MacKie Mason compared IBM's success rate when it ties to its success rate when it competes without tying. When IBM's tools are offered alone, it wins a Compuware customer 16% of the time. (MacKie Mason Rep. at 121). When IBM ties, it wins a contract for tools with a Compuware customer 81% of the time. (MacKie Mason Rep. at 121–22).

The Court finds that there is sufficient evidence of tying by IBM to continue its analysis.

B. *Not insubstantial volume of commerce affected (per se analysis)*

The Supreme Court requires that a *per se* tying arrangement affect a "not insubstantial" volume of commerce. *Eastman Kodak*, 504 U.S. at 461–2, 112 S.Ct. 2072. Compuware maintains that IBM engaged in illegal ties with at least 23 Compuware customers, resulting in lost profits of at least $43,780,076 on sales revenues much above that level. Half of IBM ties were made to customers among Compuware's top 50 accounts. (MacKie Mason dep. at 492–93).

IBM states that the fact that 90% of its mainframe customers purchase the alleged tying products without purchasing the tied products means that purchasing in a bundle is not the only viable economic option for customers. IBM alleges that Compuware has failed to establish a substantial threat of IBM acquiring market power in the alleged markets for tools where IBM's share of those markets is less than 10%. IBM argues that even if Compuware could establish that the 23 ELAs analyzed by its expert were unlawful ties, summary judgment is still appropriate because that number of offers is not enough to constitute a significant anticompetitive threat.

Regarding the 23 alleged ties, IBM alleges that they occurred over a three year period. In 15 of the cases, the customer kept an existing Compuware contract in place, along with taking IBM's tools. (Meyer Rep. Tab Y). Compuware explains this is because they had an existing contract with Compuware that had not expired. Of the 23 alleged ties, three customers chose to take something other than IBM's tools. (*Id*). According to Compuware's expert, when IBM ties, it wins a customer contract for tools 81% of the time. (Compuware Exhibit 2, MacKie Mason Rep. at 121).

■ The Court finds there is a question of fact whether IBM's tying had an effect on a "not insubstantial" volume of commerce in the tools market. Even if the rule of reason analysis would apply in this case, Compuware has satisfied the three-part test set forth by the Sixth Circuit. The only potential issue is whether there is a substantial threat that IBM will acquire market power in the tools market. This is sufficiently demonstrated by Compuware's expert witness report that IBM wins the customer 81% of the time when it ties. IBM has not adequately disputed this evidence.

### C. *Antitrust injury*

The Supreme Court has articulated certain factors to be analyzed in determining whether a plaintiff has established antitrust standing. See, *Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters*, 459 U.S. 519, 537–45, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). One of these factors is "the directness or indirectness of the asserted injury." *Id.* at 540, 103 S.Ct. 897. The Sixth Circuit "has been reasonably aggressive in using the antitrust injury doctrine to bar recovery where the asserted injury, although linked to an alleged violation of antitrust laws, flows directly from conduct that is not itself an antitrust violation." *Valley Products Co., Inc. v. Landmark*, 128 F.3d 398, 403 (6th Cir.1997).

■ Under the antitrust injury doctrine, also known as the "necessary predicate" doctrine, "plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Id.* at 402. Such a heightened standard is required because the relevant antitrust laws "were enacted for 'the protection of *competition* not *competitors.*'" *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977); *see also Indeck Energy Servs., Inc. v. Consumers Energy Co.*, 250 F.3d 972, 977 (6th Cir.2000) (dismissing antitrust claims where the only harm suffered "was in the company's capacity as a competitor in the marketplace, not as a defender of marketplace competition"). "[T]he antitrust plaintiff 'must show (1) that the alleged violation tends to reduce competition in some market and (2) that the plaintiff's injury would result from a decrease in that competition rather than from some other consequence of the defendant's actions.'" *Tennessean Truckstop v. NTS, Inc.*, 875 F.2d 86, 88 (6th Cir.1989). Without antitrust injury, no private antitrust action will lie at law or in equity. *Valley Products*, 128 F.3d at 402.

In *Valley Products*, plaintiff was charging defendants with an illegal tying arrangement in the "guest amenities" market, whereby a bar soap manufacturer was denied "preferred supplier status" in favor of two other manufacturers. The franchisor (purchaser of the amenities) decided to cut back from six suppliers to two, and plaintiff was one of the four suppliers terminated. The Sixth Circuit, held that plaintiff had failed to satisfy the "neces-

sary predicate" test. The Court found "[t]he loss of the logoed amenity sales suffered by Valley upon cancellation of its vendor agreement flowed directly from the cancellation, as we see it; the sales losses would have been suffered as a result of the cancellation whether or not HFS had entered into the alleged tying arrangements with the franchisees. Here ... the alleged antitrust violation was simply not a necessary predicate to the plaintiff's injury." *Id.* at 404.

Judge Borman conducted an analysis under the necessary predicate doctrine in *First Med Representatives v. Futura Medical Corp.,* 195 F.Supp.2d 917 (E.D.Mich. 2002). In order to apply Sixth Circuit precedent, he inserted the facts of the case before him to the language in *Valley Products:*

> If Plaintiff's injury (lost profits from the Fresenius account) "would have been suffered as a result of the [elimination of First Med as a competitor] whether or not [Futura and Bionic] had entered into the [exclusive distributorship agreement,] ... [then] the alleged antitrust violation was simply not a necessary predicate to Plaintiff's injury." [citation omitted]. Conversely, if Plaintiff's lost profits from the Fresenius account could not have been suffered without the alleged antitrust violation (the conspiracy to eliminate First Med as a price competitor), then Plaintiff has stated an antitrust injury.

*First Med,* 195 F.Supp.2d at 927.

■ IBM argues that the Court should grant summary judgment on all of Compuware's antitrust claims for the single reason that Compuware cannot show "antitrust injury." Compuware claims that IBM has (a) engaged in a campaign of predatory conduct, in which it has tied the sale of its tools to the sale of its monopoly products; (b) engaged in predatory pric-

ing; and (c) denied ISVs access to information on IBM's monopoly products that is critical to effective tools competition. Compuware states that when it has faced IBM in fair competition, Compuware wins 83.6% of the time. (MacKie Mason Rep. at 122). However, when IBM ties its tools products to its monopoly products, Compuware loses 64.7% of the time. (MacKie Mason Rep. at 122; MacKie Mason dep. at 452–53, 457–58 (a few customers purchased the IBM tools but also retained the Compuware tools)).

In the case of tying, Compuware's injuries are the result of customers being forced to take IBM's software tools. "Tying arrangements are an object of antitrust concern for two reasons—they may force buyers into giving up the purchase of substitutes for the tied product, and they may destroy the free access of competing suppliers of the tied product to the consuming market." *MCA Television Ltd. v. Public Interest Corp.,* 171 F.3d 1265, 1280 (11th Cir.1999). In *MCA,* a television station alleged that a contract requiring it to take a single program it did not want in order to receive others was an illegal tying arrangement. *Id.* at 1277. The court explained that "any antitrust injury caused by the illegal [tie]" began at "the very moment [the station's] options for seeking alternative [products] ... was foreclosed," and that "[t]his foreclosure is precisely the anticompetitive effect the proscription on [tying] was intended to prevent." *Id.* at 1280. In the present case, the injury alleged by Compuware is as a competitor, not a consumer, however the requisite harm to competition is there nonetheless. IBM acknowledges, in effect, that it would not be able to sell its inferior tools without tying. Professor MacKie Mason, Compuware's expert, opines that Compuware's customer retention rate decreases dramat-

484

ically from 84% to 35% when IBM engages in tying. (MacKie Mason Rep. At 122).

Tying results in the type of injury to competition that the antitrust laws are designed to prevent. There is an issue of fact whether Compuware suffered an antitrust injury as a result of tying by IBM. Unlike *Valley Products,* the claim here is that the injury is the direct result of tying by IBM, not because of competition from IBM entering the tools market.

### D. *Conclusion*

IBM's motion for summary judgment on Compuware's tying claim (Count V) is DENIED.

## II. *Monopolization*

### A. *Attempted Monopolization—Sherman Act— § 2*

■ Section 2 of the Sherman Act "makes the conduct of a single firm unlawful only when it actually monopolizes or dangerously threatens to do so." *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 458, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993). In order to demonstrate attempted monopolization, a plaintiff must prove: (1) that the defendant had engaged in predatory or anticompetitive conduct, (2) with a specific intent to monopolize, and (3) a dangerous probability of achieving monopoly power. *Id.* at 456, 113 S.Ct. 884.

### 1. *Predatory or Anticompetitive Conduct*

Compuware's experts, Mr. Ulrich and Prof. MacKie Mason, have speculated that the continuation of IBM's activities will drive Compuware out of business and provide IBM with a monopoly. Mr. Ulrich has opined that "IBM will ultimately drive competing ISVs of AD tools out of business because ISV products will degrade or not keep up with IBM products to the point where customers will replace those products with IBMs AD tools." (Ulrich Report at 59, Tab 5). Professor MacKie Mason concedes that IBM has a "substantial likelihood" of acquiring monopoly power in the alleged tools markets only "if it extends" its current efforts and "increases its activity". (MacKie Mason Dep. at 88–89). Professor MacKie Mason recognizes that each of the alleged tools markets is a competitive market. (MacKie Mason Dep. at 471–72). However, Professor MacKie Mason also concluded that the market is less competitive today than before IBM began its anticompetitive conduct, because "IBM controls two entry barriers for the future: it can withhold information about its monopoly products from ISV tools developers, and it can tie its tools with products over which IBM has monopoly power." (MacKie Mason Rep. at 55).

### a. *Denial of Information*

Prior to entering the tools markets, IBM had a long history of providing advance information about its mainframe products to Compuware and other ISVs. IBM's Rule 30(b)(6) witness explained that IBM provided this information because it realized sharing information with ISVs was necessary for the development of functional tools used by customers to make the IBM hardware and software work better. (Tilling dep. at 24–26). IBM's customers benefit from functional mainframe tools; therefore IBM's sharing of information was pro-competitive and pro-customer. However, IBM began to deny and delay information to Compuware and some other ISVs when it decided to enter the tools market.

The denial of critical information has allegedly resulted in a loss of features and functions in Compuware's tools. Customers are allegedly harmed because of Compuware's inability to develop features and

functions to support IBM's newer technologies. Compuware's technical expert explained that some of Compuware's customers were forced to use an older version of an IBM product because IBM refused to provide Compuware with information to support the newer version, and that other "[c]ustomers couldn't use certain features or functions" of Compuware's tools because of IBM's denials of information. (Ulrich dep. at 547). Compuware explains that to date it has been able to draw on old information it received from IBM in the 1980s and 1990s to develop "workarounds" to circumvent IBM's denials of information. Compuware predicts that in the future, with each new IBM release, Compuware's existing body of knowledge will become more and more outdated, magnifying the effects of IBM's denials of information.

One example of IBM's denial of information is that IBM refused to provide Compuware early releases of its mainframe languages, COBOL and PL/I. Prior to deciding to enter the tools markets, IBM routinely provided Compuware with such support. Compuware no longer has "day–1" support for new releases of COBOL and PL/I, which means they cannot provide support services to their customers on the first day IBM releases a new mainframe product. Such support for new releases can take months when early releases are not provided. IBM touts this advantage in its marketing materials. To make matters worse, IBM has provided several of Compuware's customers with early release versions of COBOL and PL/I. These customers could not use Compuware's tools with the prerelease versions of IBM's compilers.

The Supreme Court has repeatedly recognized that the Sherman Act does not generally require competitors to cooperate. See *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985). However, the right to refuse to deal with other firms is not unqualified. "In the absence of any purpose to create or maintain a monopoly, the act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." *Id.* at 602, 105 S.Ct. 2847 (citation omitted).

In *Aspen Skiing*, the Supreme Court affirmed the jury's verdict that the largest ski area in Aspen, Ski Co., had actually monopolized the market for downhill skiing in Aspen when it stopped accepting interchangeable lift tickets in order to drive its competitor, Highlands, out of business. The Court found that while the decision not to participate in a joint lift ticket program was not necessarily anti-competitive, the jury's verdict was supported by other evidence, including the sharp decline in Highland's market share while Ski Co.'s share increased, *Id.* at 594–95, 608, 105 S.Ct. 2847, evidence of actual harm to consumers demonstrated by consumer surveys, *id.* at 606–07, 105 S.Ct. 2847, and other exclusionary conduct by Ski Co.

"Ski Co.'s decision to terminate the all-Aspen ticket was thus a decision by a monopolist to make an important change in the character of the market." *Id.* at 604. The Court upheld the jury instruction that Ski Co's refusal to deal with Highlands "does not violate Section 2 if valid business reasons exist for that refusal." Because the jury found for Highlands, it must have concluded there were no valid business reasons for the refusal.

The Court looked at the impact the defendant's refusal to deal with a competitor had on consumers, the competitor, and on itself. The Court ultimately found that consumers were better off with a joint lift

ticket option, Highlands was worse off because it lost market share, and that Ski Co. had no business justification for what it did other than to forego short-run benefits in order to reduce competition by harming its smaller competitor. If a firm has attempted to exclude rivals on some basis other than efficiency, the Court concluded it is fair to characterize its behavior as predatory.

The impact on consumers of IBM's refusal to share information with Compuware is that the price of tools has decreased and consumers have another product from which to chose, although the overall quality of Compuware's tools has arguably been reduced.

The adverse impact of IBM's conduct on Compuware is that it cannot compete as effectively as it used to when IBM shared information about Its products prerelease. Compuware, however, has demonstrated its ability to adequately protect itself from the loss of the prerelease IBM information, at least to date. Compuware has been able to develop "workarounds" using information it received from IBM in the 1980s and 1990s. Compuware maintains high market share in the tools market, while IBM remains in the single digits.

■ In *Aspen Skiing*, Ski Co. had been found to be a monopolist, and had been a competitor in the relevant market for years before refusing to participate in the joint lift ticket. In addition, Ski Co.'s stated reason for Its change in dealing with Highland, difficulty in administering the system, was found to be without merit. In this case, IBM is obviously not a monopolist in the tools market, but purportedly entered the tools market to stop what it perceived as the gouging of its mainframe products customers by Compuware. This is a legitimate reason for IBM to withhold information from Compuware if accepted by the fact finder. Furthermore, IBM has continued to provide information about its products prerelease to other ISVs, which are undoubtedly considered to be less of a threat than Compuware.

Given IBM's very small market share in tools, the Court finds that Compuware cannot establish that the limited withholding of information to date sufficiently demonstrates anticompetitive conduct supporting a claim of attempted monopolization. IBM's business justification for withholding information from Compuware further diminishes the viability of this basis for an antitrust claim.

### b. *Predatory Pricing*

■ The Supreme Court has required that plaintiffs asserting predatory pricing claims show that the pricing in question is "below an appropriate measure of it's rival's costs." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993). IBM contends that most courts have found that the appropriate measure of incremental cost is marginal cost, or average variable cost. The Supreme Court declined to resolve the conflict among the lower courts over the appropriate measure of cost. *Id.* at 222 n. 1, 113 S.Ct. 2578. The Sixth Circuit has not ruled on this issue since the decision in *Brooke Group.* However, prior to *Brooke Group,* the Sixth Circuit had occasion to address the issue of predatory pricing in *D.E. Rogers Assocs., Inc. v. Gardner–Denver Co.,* 718 F.2d 1431, 1436 (6th Cir.1983). In *Gardner–Denver* the Sixth Circuit ruled that predatory pricing may be established where the defendant has priced below its average total cost and there is other evidence that its motive was predatory. Any evidence of the rationale behind defendant's pricing policy may be considered. *Id.* This decision has not been overruled by the Supreme Court or the Sixth Circuit,

and is still considered to be the law in this circuit.

Compuware relies on the opinion of Prof. MacKie Mason that IBM priced its tools below average total cost. (MacKie Mason Rep. at 114–18). In fact, IBM gave its tools to many customers for free, which is obviously lower than average total cost. In an effort to show that IBM's motive was predatory, Compuware refers to IBM's alleged plan to eliminate Compuware and other ISVs from the tools market, as well as its denial of critical information to ISVs.

"Pricing is predatory when a company foregoes short-term profits in order to develop a market position such that the company can later raise prices and recoup profits." *Gardner–Denver,* 718 F.2d at 1436. Compuware alleges a dangerous probability of IBM "recouping its investment in below-cost prices." (MacKie Mason Report at 224). Compuware maintains that IBM will be able to control prices through continued use of its ability to erect barriers to entry and eliminate effective competition. Once the power to control prices is attained, IBM will be In a position to recoup any losses from its below-cost pricing. However, where there is no dangerous probability that IBM will monopolize the alleged tools markets, there is no dangerous probability that IBM would maintain such a monopoly long enough to seek recoupment. (See section II.A.3. below).

Compuware has failed to present sufficient evidence of predatory pricing to sustain an antitrust violation.

### c. *Tying*

Compuware's illegal tying allegation is sufficient to support a claim of attempted monopolization if the other factors are present.

### 2. *Intent to Monopolize*

In order to prove the necessary intent to monopolize, inquiry should be made whether defendant has engaged in "unfair" or "predatory" tactics. In this case there is evidence of tying by IBM. There is also evidence that IBM believes it will eliminate Compuware and other ISVs and achieve a monopoly position. Statements by IBM's market manager for the tools that "Compuware cannot survive" and by IBM's S/390 Software Sales Manager that IBM "could get close to putting BMC and Compuware out of business—or into takeover situation ...", lend support to the argument that IBM will succeed in its quest.

### 3. *Dangerous Probability of Monopolization*

To prove a dangerous probability of monopolization in an attempt case "requires inquiry into the relevant product and geographic market and the defendant's economic power in that market." *Spectrum Sports,* 506 U.S. at 459, 113 S.Ct. 884. Market power "is often indicated by market share." *Tarrant Serv. Agency. Inc. v. Am. Standard, Inc.,* 12 F.3d 609, 615 (6th Cir.1993). However, the Sixth Circuit has recognized that a plaintiff may produce "other evidence that [defendant] was capable of a dangerous probability of success in destroying competition in the relevant product market or controlling prices." *Id.* at 615–16.

IBM argues that it has no market power, and only a very small market share, in the alleged tools markets. Specifically, IBM maintains that its single-digit market share is insufficient to establish market power as a matter of law. IBM argues that its market share has remained relatively stable since it entered the market, and its projected growth in the tools mar-

kets is modest. IBM cites to several Sixth Circuit cases in which much higher market shares were held to be insufficient to constitute a dangerous probability of monopolization. *See, e.g., Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.,* 917 F.2d 1413, 1434 (6th Cir.1990) (where defendant's market share averaged 24%, plaintiff "failed to prove that defendants' . . . share of the relevant market is sufficient, as a matter of law, to constitute a dangerous probability of monopolization"), *White & White, Inc. v. Am. Hosp. Supply Corp.,* 723 F.2d 495, 507 (6th Cir.1983) (finding 25% market share insufficient despite "[t]he serious anticompetitive character and objectives of defendant's conduct").

More than four years after launching its tools, IBM still has only a single-digit market share. Compuware's expert "couldn't say with any degree" of precision how long it would be until IBM will have monopolized these markets, speculating that a "reasonable upper point" on the time it would take was "5 to 10 years". (MacKie Mason Dep. at 98–99).

Compuware points out that it is not relying on market share evidence. Rather, Compuware relies on the following: (a) as the monopoly provider of various products upon which the tools depend, IBM has a uniquely powerful ability to exclude competition from the tools market; (b) IBM will gain power over price by continuing to refuse to provide Compuware with information on the IBM mainframe environment and by forcing customers to take its tools through tying; and (c) IBM personnel believe that it will achieve a monopoly position in the tools market.

█ While Compuware has proffered evidence tending to show that IBM is capable of a dangerous probability of success in destroying competition, the fact is that after four years of enduring IBM's "anticompetitive and predatory" conduct, Com-

puware still has the largest market share in the alleged tools market and IBM still has only single digit market share. Compuware is the strongest tools vendor with more than 70% share of the alleged tools markets, 90% customer retention rates and a 71% gross profit margin, as calculated by its own damages expert. (Meyer Rep. at Tab Q). IBM's market share has remained stable and low, despite its anticompetitive acts and objectives. Compuware has not succeeded in showing that IBM has a dangerous probability of monopolization.

### 4. *Antitrust Injury*

█ Although the Court concludes that Compuware's attempted monopolization claim fails because IBM does not have a dangerous probability of monopolization, there is also a lack of antitrust injury with regard to some of the alleged predicate acts. Without the information it previously received from IBM it may be more difficult for Compuware to keep up with IBM's changing technology, but whether due to its resourcefulness or expert talent, Compuware has managed to remain a leader in the software tools industry. The speculative future injury alleged by Compuware is insufficient to establish antitrust injury. Compuware's lack of antitrust injury may be further demonstrated by the remedy it seeks: a transfer of IBM's tools sales to Compuware, at prices Compuware claims it would have charged, and a permanent injunction. "[T]he examination of the remedy sought is a clue to whether there is antitrust injury. If the plaintiff simply wants the transfer of benefits that a defendant is reaping in the market, without discernable benefits to consumers, it is likely that no antitrust injury exists." *Phillips Getschow Co. v. Green Bay Brown Cty., Prof. Football Stad. Dist.,* 270 F.Supp.2d 1043, 1048 (E.D.Wis.2003).

### 5. *Conclusion*

IBM's motion for summary judgment on Compuware's attempted monopolization claim (Count VII) is GRANTED.

### B. *Monopoly Leveraging—Sherman Act § 2*

The Supreme Court has affirmed that in order to sustain a monopoly leveraging claim a plaintiff must demonstrate a "dangerous probability of success" in the "second market". *Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 124 S.Ct. 872, 883 n. 4, 157 L.Ed.2d 823 (2004). The Court having concluded that IBM does not have dangerous probability of success in the secondary tools market, summary judgment is GRANTED on Compuware's monopoly leveraging claim (Count VI).

### III. *State Unfair Competition Claims*

In its Second Amended Complaint, Compuware asserted 12 state unfair competition claims (Counts IX–XX). IBM moved for summary judgment on eight of the 12 claims. Five of the claims were voluntarily dismissed by Compuware (Counts XI, XII, XV, XVII, and XX). This leaves three claims that are subject to IBM's motion for summary judgment (Counts IX—California, XIV—North Carolina, and XVIII—Utah). IBM's argument for granting summary judgment as to these three state antitrust claims is lack of antitrust injury. To the extent the Court has found potential antitrust injury as to Compuware's allegations based on illegal tying, summary judgment is denied on the three state antitrust claims. There are four remaining state law claims that are not the subject of any summary judgment motion (Counts X—Connecticut, XIII—Nebraska, XVI—South Carolina, and XIX–Washington).

### CONCLUSION

IBM's motion for summary judgment is GRANTED as to attempted monopolization (Count VII) and monopoly leveraging (Count VI).

IBM's motion for summary judgment is DENIED as to unlawful tying (Count V), California unfair competition (Count IX), North Carolina unfair competition (Count XIV), and Utah unfair competition (Count XVIII).